**S. Simpson GRAY, Plaintiff,**

v.

**BOARD OF HIGHER EDUCATION, CITY OF NEW YORK, Dr. Robert Kibee, as Chancellor, Bd. of Higher Education, City of New York; City University of New York, Fiorello H. LaGuardia Comm. College, Dr. Joseph Shenker, as President, LaGuardia Comm. College; Dr. Martin Moed, as Vice President and Dean of Faculty and member of College P & B Committee; Dr. Flora Mancuso, as Associate Dean of Faculty; Prof. Donald Davidson, as member, College-wide P & B Committee and PSC representative; Dr. Ira Epstein, Dr. George Hamada, Dr. Jeffrey Kleinberg, Dr. Harry Heinemann, Dr. Roberta Matthews, as member of the P & B; Ronald C. Miller, as Chairman, Accounting/Managerial Studies Dept.; Dr. Joel Millonzi and Dr. Robert O'Pray, as members of P & B, Mary E. Ryan, as Director of Personnel and Affir. Action Office and Grievance Designee; Prof. Frank Timoni; Dr. John Muelin, as former member of Dept.; Dr. Rose Palmer, in former capacity as Chairperson, Business Division, member of P & B, all individually and in their respective capacities, jointly and severally, and the Professional Staff Congress, Defendants.**

No. 79 Civ. 0062.

United States District Court, S. D. New York.

Nov. 9, 1981.

S. Simpson Gray, Law Clinics of Mott & Gray, P. C., Mount Vernon, N. Y., pro se plaintiff.

Allen G. Schwartz, Corp. Counsel, Judith A. Levitt, Charles R. Foy, Leslie C. Kamelhar, David B. Rigney, Jack Muraskin, Asst. Corp. Counsels, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

PIERCE, District Judge.

Plaintiff S. Simpson Gray brought this action pursuant to 42 U.S.C. §§ 1981, 1983, and 1985 alleging that his constitutional rights were violated when, after five years of teaching in the City University system, he was denied reappointment with tenure in the Accounting and Managerial Studies Department at LaGuardia Community College ("LaGuardia") for the 1979–1980 academic year. This denial was allegedly due to unconstitutional racial discrimination.

In the course of the discovery process plaintiff sought to discover the votes of two of the named defendants, Dr. Martin Moed, and Dr. Randall C. Miller, with regard to Mr. Gray's reappointment and/or promotion with tenure. When Dr. Moed and Dr. Miller refused to answer questions with regard to their votes plaintiff moved pursuant to Rule 37 of the Fed.R.Civ.P. to compel their responses. On September 28, 1979 plaintiff's motion and defendants' cross-motion for a protective order were referred by this Court to Magistrate Ruth Washington to hear and recommend. In a Report and Recommendation dated April 7, 1981 Magistrate Washington recommended that the Court order defendants Moed and Miller to respond to the questions regarding their votes on plaintiff's requests for promotion and/or reappointment with tenure. The defendants duly filed objections to Magis-

trate Washington's report urging the Court to protect the information sought pursuant to a qualified privilege under F.R.E. Rule 501. In addition, plaintiff filed a brief urging adoption of the Magistrate's report, and the Committee on Legal Affairs of the City University of New York filed a brief as amicus curiae urging reversal.

The Court is thus faced with the question whether it should order defendants Moed and Miller to answer plaintiff's questions with regard to how they each voted with regard to plaintiff's applications for promotion and/or tenure, or whether it should protect the confidentiality of those votes, either by recognizing a qualified privilege asserted by the defendants with regard to such votes or as a matter of the Court's discretion to limit and control discovery.

For the reasons that follow herein this Court reverses the Magistrate and declines to order defendants Moed and Miller to respond to plaintiff's questions.

*Tenure Provisions*

This case arises in the context of a New York statute, N.Y. Education Law § 6206–b(3), which provides that "the permanent instructional staff shall consist of all persons employed on an annual salary basis in the community colleges sponsored by the board ... who after serving on an annual salary in any of the positions enumerated ... for five full years continuously, have been appointed or shall be appointed for a sixth full year." Thus, a member of the teaching staff, such as Mr. Gray, must either be denied renewal of his contract after that fifth teaching year, or receive tenure. The Board's reappointment of a teacher for a sixth year without an express grant of tenure will result in a grant of tenure by operation of law. *See* N.Y. Education Law § 6206–b.

■ It is settled that a non-tenured teacher has no vested right to continuity of employment and has no vested expectation of tenure. *See Board of Regents v. Roth*, 408 U.S. 564, 577–78, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). With regard to the provisions as to the grant of tenure to secondary school teachers, which are equivalent in substance to N.Y. Education Law § 6206–b, the New York Court of Appeals has held that the Education Law vests authority to make tenure decisions in the Board of Education; that a non-tenured teacher may be refused tenure without reasons being given therefor; and that a collective bargaining agreement in which the school board purports to surrender its right to terminate the employment of a teacher at the end of his or her probationary period without giving reasons was void as against public policy. *Cohoes City School District v. Cohoes Teachers Association*, 40 N.Y.2d 774, 390 N.Y.S.2d 53, 55–56, 358 N.E.2d 878 (1976).

Section III of the Statement of the Board of Higher Education on Academic Personnel Practice in the City University of New York (effective January 1, 1976) ("Statement") sets out personnel review policies for all of the colleges controlled by the Board of Higher Education. It states that "[t]he Board reaffirms the Commission's insistence that the decision to reappoint and the decision to tenure are two separate and distinct acts. Similarly, the Board reaffirms its position that no appointment carries with it the presumption of reappointments or of eventual tenure." In Section IV, the Statement provides that "[t]he decision to grant tenure shall take into account institutional factors such as the capacity of the department or college to renew itself, the development of new fields of study, and projections of student enrollment."

Further, the Board of Higher Education Personnel and Budget Procedures dated December 18, 1967 state in Point 2:

> "At every step in the appointment and reappointment procedure, it should be made clear to the candidate and to all concerned that, until the candidate gains tenure under the provisions of the statute and the bylaws of the Board, each appointment is for one year, there is no presumption of reappointment, and no reasons for non-reappointment need be given.

\* \* \* \* \* \*

"[T]he necessity to give reasons for non-reappointment, with the consequent receipt of rebuttals, explanations and submission of contrary expert opinion, places the college and its P&B committees in the position of defendant rather than judge. College officials would soon find their time, energies and talents dissipated in disputes. Academic excellence could not thrive in that atmosphere and a premium would be placed on peaceful mediocrity. Often the reasons have nothing to do with the candidate himself (he may indeed be satisfactory), but rather with the possibility that better candidates, with wider backgrounds, more versatility, or specialties which are more likely to be of use to the department in the years to come, may be available, and the department does not desire to foreclose the opportunity to attract such candidates. More importantly, any requirement that reasons be given for non-appointment would have the effect of instituting a type of presumptive tenure inimical to the conduct of the colleges as institutions of higher learning."

■ Although a non-tenured teacher may be denied reappointment with tenure for any reason or in the absence of stated reasons, an exception is made where it has been established that the dismissal was for constitutionally impermissible reasons. *Cohoes City School District, supra,* N.Y.S.2d at 55, 358 N.E.2d 878. The plaintiff in this case contends that his termination at LaGuardia after his fifth year of teaching was motivated by such impermissible reasons.

## The Right to Discovery

Fed.R.Civ.P. Rule 26(b) states that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as any "evidence having the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Finally,

Rule 501 of the Federal Rules of Evidence deals with privileges. It provides that "[e]xcept as otherwise required by the Constitution of the United States or provided by Act of Congress or in the rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." According to the Supreme Court, the Congress, in enacting F.R.E. Rule 501, intended to avoid freezing the law of privilege, in order to " 'provide the courts with the flexibility to develop rules of privilege on a case-by-case basis' and to leave the door open to change." *Trammel v. U. S.,* 445 U.S. 40, 47–48, 100 S.Ct. 906, 911, 63 L.Ed.2d 186 (1980).

Any finding that information is protected from discovery must reflect a balancing between, on the one hand, the parties' right to discovery, which stems from society's interest in a full and fair adjudication of the issues involved in litigation and, on the other hand, the existence of a societal interest in protecting the confidentiality of certain disclosures made within the context of certain relationships of acknowledged social value.

Wigmore specifies four fundamental conditions which he asserts are necessary to the establishment of a privilege against the disclosure of communications. First, the communications must have been made with the understanding that they would not be disclosed. Second, the element of confidentiality must be essential to the full and satisfactory maintenance of the relationship between the parties. Third, the relationship must be one which, in the opinion of the community, ought to be sedulously fostered. Fourth, the injury that will inure to the relationship by virtue of the disclosure of the communications must outweigh the benefit that would result from forcing a witness to disclose the information. WIGMORE, EVIDENCE, § 2285 at 527. The courts have looked to these or similar crite-

ria in numerous cases. *See, e. g., Robinson v. Magovern,* 83 F.R.D. 79, 88 (W.D.Pa. 1979).

In making its appraisal of the benefit likely to be gained by disclosure of communications as to which a claim of privilege is asserted the court must consider whether the desired information is available from other sources; whether the desired information goes to the heart of the matter at issue; the degree of harm that would be caused by disclosure; and the type of controversy before the court. (The court will more readily compel disclosure of facts and materials necessary to the conduct of a criminal investigation or grand jury proceeding than to compel production of materials that are not central to the resolution of a civil action when requested to do so by civil litigants.) *See Zerilli v. Smith,* 656 F.2d 705 (D.C.Cir.1981); *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433, 438 (10th Cir. 1977); *Baker v. F&F Investment,* 470 F.2d 778, 783 (2d Cir. 1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *In re Franklin National Bank Securities Litigation,* 478 F.Supp. 577, 582 (E.D.N.Y.1979); *Lora v. Board of Education,* 74 F.R.D. 565 (E.D.N.Y.1977); *Richards of Rockford, Inc. v. Pacific Gas & Electric Co.,* 71 F.R.D. 388, 390 (N.D.Cal.1976); *Apicella v. McNeil Laboratories, Inc.,* 66 F.R.D. 78, 80, 82, 85 (E.D. N.Y.1975); *McKillop v. Regents of University of California,* 386 F.Supp. 1270 (N.D. Cal.1975).

In recent decisions a number of courts have applied these principles in obeying the admonition of *Trammel v. U. S., supra,* 445 U.S. at 47–48, 100 S.Ct. at 906, to allow the development of rules of privilege on a case-by-case basis. These courts have either found that in the circumstances of those cases an evidentiary privilege should exist to protect information not otherwise protected under the traditional law of privilege or that the court, pursuant to its discretion to limit and control discovery under Fed.R. Civ.P. Rule 26(c), would not order the production of the requested information. *See,* for example, *Zerilli v. Smith,* 656 F.2d 705 (D.C.Cir.1981) (qualified reporter's privilege in civil cases); *Rosario v. New York Times,* 84 F.R.D. 626 (S.D.N.Y.1979) (finding existence of a qualified privilege of "self-examination" and an editorial privilege); *Lloyd v. Cessna Aircraft Co.,* 74 F.R.D. 518 (E.D. Tenn.1977) (Court ordered answers to limited questions, but held that the Government could not inquire as to details of discussions or events which took place at self-evaluative staff meetings, or as to the contents of any records, reports, memoranda or minutes which may have resulted from any such meeting); *Richards of Rockford, Inc. v. Pacific Gas & Electric Co.,* 71 F.R.D. 388 (N.D. Cal.1976) (protecting confidentiality between academic researchers and their sources; decision based on the court's supervisory powers over discovery); *McKillop v. Regents of the University of California,* 386 F.Supp. 1270 (N.D.Cal.1975) (protecting confidentiality of documents in tenure files on basis of official information privilege); *Banks v. Lockheed-Georgia Co.,* 53 F.R.D. 283 (N.D.Ga.1971) (protecting reports containing self-analysis and evaluation of company's actions in the area of equal employment opportunities); *Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249 (D.D.C.1970), *aff'd,* 479 F.2d 920 (D.C.Cir.1973) (protecting confidentiality of hospital staff review committee meetings).

The Court will examine the claim of privilege asserted by the defendants in this matter in light of the foregoing principles.

*The Peer Review System for Granting Tenure*

Academic freedom is a value which the Supreme Court has found to be of constitutional significance. In *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967), the Court stated that "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us . . . . That freedom is therefore a special concern of the First Amendment." In addition, in his concurring opinion in *Sweezy v. New Hampshire,* 354 U.S. 234, 236, 77 S.Ct. 1203, 1204, 1 L.Ed.2d 1311 (1957), Justice Frankfurter suggested that there should be recognized "four essential freedoms" for an insti-

tution of higher education: the freedom "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study."

The tenure system is an essential linchpin in the commitment to safeguard the academic freedom of individual teachers. The 1940 *Statement of Principles* of the American Association of University Professors recognized the importance of a tenure system to the maintenance of academic freedom. It provided:

"Academic freedom requires that a professor should receive effective protection of his economic security through a tenure system which should provide at least these safeguards:

1. A probationary period of stated length, the maximum conforming to a national standard.

2. A commitment by an institution of higher education to make a decision in advance of the end of the probationary period whether a permanent relationship will be entered into; collaterally, national standards of notice for such decisions.

3. Appointment to a tenure post if a person is continued beyond the limit of the probationary period.

4. Termination of a tenure appointment only because of age under an established retirement system, financial exigency, or adequate cause."

L. Joughin, Academic Freedom and Tenure (University of Wisconsin Press 1967) at 5–6.

The peer review system of decision making with regard to the granting or withholding of tenure is intended to ensure that academic considerations will be of primary concern in the decision whether or not to grant tenure, and has been said to embody "the essence of academic freedom." *Kunda v. Muhlenberg College*, 621 F.2d 532, 547 (3d Cir. 1980). "The peer review system has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution." *Kunda, supra*, at 548.

The maintenance of the confidentiality of the decision-making process is generally an integral element of a peer review system for granting or withholding tenure. *McKillop v. Regents of the University of California*, 386 F.Supp. 1270, 1276 (N.D.Cal.1975) ("Plaintiff's suggestion that full disclosure encourages more thoughtful and honest tenure evaluations represents a somewhat utopian view of human relationships."). *See*, Note, *Preventing Unnecessary Intrusions on University Autonomy: A Proposed Academic Freedom Privilege*, 69 Calif.L. Rev. 1538, 1551–52 (1981). In an affidavit submitted in support of defendants' objections to Magistrate Washington's Report and Recommendation in the case at bar, David B. Rigney, Vice Chancellor for Legal Affairs of the City University of New York stated:

"4. It is University policy ... that the 'substance or even the nature of the discussion' at meetings of college or department promotion and budget committees be held in strict confidence by the members. It is professional misconduct for a member of such a committee to reveal such information.

5. The policy of confidentiality was adopted because personnel actions are based on professional peer judgments where utmost frankness is required. The Max-Kahn Memorandum stated, 'There is little likelihood that leaders in the world of scholarship and college teaching will give us the benefit of their candid opinions of colleagues in their fields if they cannot be assured of confidentiality.'"

The Personnel and Budget Procedures, dated December 18, 1967, state in § B(1)(a) that voting at personnel and budget committee meetings with regard to reappointment, promotion, and tenure "should be by secret ballot."

The secret ballot has long been regarded as essential to any voting process which is to be free of influence and pressure from those with power and/or influence over those voting. In *U. S. v. Executive Committee of the Democratic Party of Greene County, Ala.*, 254 F.Supp. 543 (N.D.Ala. 1966), the court stated that "[t]he secrecy of

the ballot is one of the fundamental civil liberties upon which a democracy must rely most heavily in order for it to survive." This view was recognized by Congress in its passage of the National Labor Relations Act. That Act, specifically 29 U.S.C. §§ 159(e)(1) and 179(b), requires that employee votes to rescind designation of a labor organization as the employees' bargaining agent, or to accept or reject a settlement proposal, must be conducted by secret ballot. The requirement of "complete secrecy of the ballot cannot be waived." *Magic Pan, Inc. v. N. L. R. B.*, 627 F.2d 105, 109 (7th Cir. 1980). *See also N. L. R. B. v. Groendyke Transport, Inc.*, 372 F.2d 137, 141–42 (10th Cir.), *cert. denied*, 387 U.S. 932, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967).

While it is certainly true that generally those voting on tenure decisions are not concerned about reprisals from those about whom they must make judgments, the maintenance of secrecy in the voting process is nevertheless of great value. It is not difficult to perceive that the failure to maintain the confidentiality of votes on tenure decisions would tend to promote divisiveness *among faculty members*, and could well lead to Department Chairmen and those with greater influence exerting a disproportionate impact on such decisions. In fact, if the process for awarding tenure did not require that voting occur by secret ballot, plaintiff's argument that Drs. Moed and Miller might have unduly influenced the other members of the committee through their votes would be more convincing.

█ Having concluded that the preservation of the confidentiality of voting with regard to tenure decisions is of value to society; that the communications made during such decision-making were made in reliance on the expectation that they would not be disclosed; that the element of confidentiality is necessary to the promotion of professional and harmonious relationships between the parties; and that the relationship is one which ought to be fostered, this Court must decide whether the anticipated adverse consequences to the faculty peer review system that would be apt to follow from mandated disclosure of the information requested by plaintiff outweighs the benefit to be gained by the individual litigant as a result of such disclosure.

Discovery of defendants' individual votes with regard to his reappointment, promotion, and tenure is, to be sure, certainly not the sole avenue by which plaintiff can obtain evidence in support of his claim that his constitutional rights have been violated. Plaintiff has already been given the number of votes cast for and against his reappointment and promotion (see affidavits of Martin G. Moed and Ronald C. Miller, dated May 12, 1981). He also has the reports and evaluations, some positive and some negative, on which the tenure decision presumably rested. In addition, plaintiff has access to and in fact has presented the Court with some statistical and historical data which may show disparate treatment of minority group members in faculty hiring, promotion, or grants of tenure, both at LaGuardia and throughout the City University system.

It is also not clear to the Court that the specific information sought by plaintiff even addresses the matter at issue. It is unclear in what way knowledge of specifically *who* voted for or against plaintiff's retention will clarify the motivation—either proper or improper—for the committee vote. Further, plaintiff specifically alleges that the denial of tenure was the result of a negative evaluation of his performance prepared by defendant Professor Miller. Thus, if Professor Miller voted in the negative, this would simply be consistent with his stated opinion as to plaintiff's qualifications for tenure; on the other hand, a positive vote would certainly not prove that the committee was improperly motivated by plaintiff's race when it voted to deny him tenure.

While the protection of the constitutional rights of individual litigants is of serious concern to society, the matter before the Court is neither a criminal investigation nor a grand jury proceeding in which the courts will most vigorously enforce society's need for information despite assertion of a qualified right to confidentiality which does not fall readily into one of the traditionally

recognized privileges against disclosure. This action is also not an isolated one, but is of a type that is brought frequently in this Court. A decision by this Court to the effect that defendants' individual votes with regard to plaintiff's application for reappointment, promotion, and tenure are subject to discovery, could therefore have a substantial impact on expectations of confidentiality and, consequently, on the decision making process which relates to granting or withholding tenure.[1]

*Conclusion*

In light of the foregoing, the Court concludes that in weighing the potential effects of ordering disclosure, against the potential benefits of disclosure, the scales tip decidedly toward the protection of the confidentiality of the faculty peer review system which it views as embodying a broader societal value. The Court therefore reverses the Report and Recommendation of Magistrate Washington, filed April 7, 1981, and declines to order defendants Moed and Miller to answer plaintiff's questions with regard to their individual votes on plaintiff's application for reappointment, promotion and tenure—both because the secret tenure votes here meet the criteria for the application of a qualified privilege as they are set out in the caselaw noted above,[2] and as a matter of the Court's discretion to limit and control discovery.

The parties are directed to appear before the undersigned for a pretrial conference on Tuesday, December 8, 1981 at 9:30 a. m. in Courtroom 706.

SO ORDERED.

---

1. The Court's decision need not reflect approval of every judgment regarding tenure that is reached through the faculty peer review system at issue here in order to endorse the view that this system is one of such overall value to the goal of academic freedom and to society that its confidentiality should be protected in the absence of a showing of compelling circumstances to the contrary.

2. The Court is aware of the case of *Blaubergs v. Board of Regents of the University System of Georgia,* 625 F.2d 1146 (M.D.Ga.1980), in which the District Judge ordered a professor to reveal his vote at a tenure committee meeting. The Court has considered that opinion in assessing the balancing process which this Court views as necessary to its decision on the discovery issue which it faces in the matter at bar.