In re Pasquale J. VESCIO and Vatsala Vescio, Debtors,

THE MERCHANTS BANK, Amresco New England II, Inc., Plaintiffs

v.

Pasquale J. VESCIO and Vatsala Vescio, Defendants and Counterclaim Plaintiffs

v.

THE MERCHANTS BANK, Counterclaim Defendant.

Bankruptcy No. 96–10153.
Adv. No. 96–1015.

United States Bankruptcy Court, D. Vermont.

April 28, 1997.

J.T. Schwidde, of Glinka & Schwidde, Rutland, Vt., and L. Chalidze, of Miller & Faignant, Rutland, Vt., for Debtors/Defendants/Counterclaim Plaintiffs Pasquale and Vatsala Vescio (Debtors).

R.A. Pinel, of Miller, Eggleston & Cramer, Ltd., Burlington, Vt., for The Merchants Bank (Bank).

T.L. Holzman, of the Federal Deposit Insurance Corp. (FDIC), Washington, D.C., and C. Shea, Esq., of the U.S. Attorney's Office, Burlington, Vt., for FDIC.

K.H. Wheatley, and D.B. Jordan, of the Federal Reserve, Washington, D.C., and C. Shea, of the U.S. Attorney's Office, Burlington, Vt., for the Board of Governors of the Federal Reserve System (Fed).

## MEMORANDUM OF DECISION DENYING PRIVILEGE ASSERTED BY FEDERAL RESERVE BANK

FRANCIS G. CONRAD, Bankruptcy Judge.

Our December 9, 1996 Order on Counter–Claimant Vescios' Motion to Compel[1] required Bank to disclose four categories of documents, including investigative materials and bank examination reports generated by FDIC and Fed. More particularly, we required:

1) full disclosure by The Merchants Bank of all documentation, no matter by whom generated, relating to investigation of The

---

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the General Reference to this Court under Part V of the Local District Court Rules for the District of Vermont. *This is a core matter under 28* U.S.C. §§ 157(b)(2)(A), (B), and (O). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable by F.R.Bkrtcy.P. 7052.

Merchants Bank and/or Merchant Banc-shares, Inc. by the FDIC, the Federal Reserve, and other related bank regulatory entities, including the examination reports, which documentation the Court finds to be of relevance to the claims asserted against TMB; 2) TMB's lending manuals and all information on TMB's lending procedures, customs, practices and guidelines; 3) TMB's procedures, customs, practices and guidelines on compensation of its lending and work-out officers ...; and 4) TMB's procedures, customs, practices and guidelines in relation to the work-out of troubled loans.

*Merchants Bank v. Vescio*, No. 96–1015, 2 (Bkrtcy.D.Vt. Dec. 9, 1996) (order on counter-claimant Vescios' motion to compel). Bank took an interlocutory appeal to the District Court, which reversed our holding as to the first category of documents. *Merchants Bank v. Vescio*, 205 B.R. 37, 41–42 (D.Vt.). The District Court held that there exists a qualified "bank examination privilege" which may apply to those documents. *Id.*, at 42–43. The matter was remanded to

us with instructions to review the disputed material *in camera*, to determine whether the privilege applies. *Id.*, at 43. The District Court specifically held that the documents "described in subsections (2) through (4) of [our] order[ ] are purely factual matters for which the bank examination privilege is not available." [2] *Id.*

This Memorandum of Decision is concerned solely with those documents involving Fed.[3] We will address FDIC's claims of privilege as to other documents in a separate memorandum to follow.

Bank provided us with two sets of the disputed documents,[4] one unredacted, and the other with Fed's proposed redactions. We will order the release of all 13 documents in their unabridged form because, after review, we find that none are subject to the banking examination privilege. We hold, in the alternative, that even if the documents are privileged, the interests of justice require that the privilege be overridden. In any event, the Fed's interests in confidentiality

---

2. As we note below, some of the items withheld as belonging in the first category in fact belong in the categories described by the District Court as "purely factual."

3. Bank is chartered by the State of Vermont, which makes it subject to oversight by FDIC, whose privilege claims are considered separately. Fed regulates bank holding companies, including Bank's parent, Merchants Bancshares, Inc. ("Bancshares").

4. The organization of the documents into 13 categories by Fed is somewhat arbitrary and inconsistent. Cover letters and summaries are sometimes included with the documents to which they relate and sometimes not. The 13 sets of documents, as provided to us, are:

 1. Feb. 7, 1994 letter from Federal Reserve to Bancshares forwarding for execution a Written Agreement between Bancshares and Fed, and a copy of the Agreement as executed by Bancshares on Feb. 18, 1994.
 2. Feb. 12, 1996 letter from Fed to Bancshares forwarding inspection report, with attached form letters of acknowledgment of receipt and review, and Report of Bank Holding Company Inspection (Nov. 30, 1995 Inspection Date).
 3. Aug. 25, 1995 letter from Fed to Bancshares, forwarding Items 4 & 5, and summarizing their contents. Acknowledgment letters are referred to but not included.

4. Summary to Directors of Inspection Findings, for inspection conducted as of March 31, 1995.
 5. Report of Bank Holding Company Inspection (Feb. 16 1995 Inspection Date).
 6. August 25, 1994 letter from Fed to Bancshares, with attached form letters of acknowledgment of receipt and review, forwarding Items 7 & 8, and summarizing their contents.
 7. Report of Bank Holding Company Inspection (Jan. 10, 1994 Inspection Date).
 8. Summary to Directors of Inspection Findings for inspection conducted as of March 31, 1994.
 9. October 24, 1994 letter from Bancshares to Fed, reporting on actions taken in response to Items 6–8.
 10. April 26, 1996 letter from Bancshares to Fed forwarding "Quarterly Progress Report noting actions taken relative to" Item 1, and copy of the Report.
 11. July 19, 1993 letter from Bancshares to Fed, reporting on actions taken in response to Items 12–13.
 12. May 17, 1993 letter from Fed to Bancshares, with attached form letters of acknowledgment of receipt and review, forwarding Item 13, and summarizing its contents.
 13. Report of Bank Holding Company Inspection for April 19, 1993—April 23, 1993 inspection.

will be aided by a protective order, as hereinafter provided.

## FACTUAL BACKGROUND

This action commenced with Bank's state court foreclosure action against Debtors, who fired back with a slew of affirmative defenses and counterclaims. The matter was removed here after Debtors filed for relief under Chapter 11. Among the 14 affirmative defenses alleged in their October 9, 1996 Amended Affirmative Defenses and Counterclaims, we find that various aspects of the documents before us now are arguably relevant to Debtors' defenses of unclean hands, equitable estoppel, breach of fiduciary duty, contractual bad faith, breach of contract, tortious interference with contract, promissory estoppel, duress, and failure to mitigate. Eight of the nine counterclaims are also implicated—contractual bad faith, breach of contract, tortious interference with contract, fraud, negligent misrepresentation/constructive fraud, negligence, and negligent supervision.

Debtors' version of the underlying events, as gleaned from their counterclaims, begins in 1991, when Merchants issued the first in a series of commitment letters to Debtors for financing of a supermarket and shopping center Debtors sought to develop in West Brattleboro, Vermont. When the supermarket tenant pulled out in June of 1992, Debtors advised Bank that they wanted to abandon the project. Bank, Debtors say, persuaded them to keep going, then delayed approval of construction financing for more than a year, from June 1992 to July 1993, despite repeated intermittent promises that closing was imminent. Debtors contend Bank's delays increased costs, which Bank then refused to finance, encouraging Debtors instead to become heavily mortgaged and financially overextended. Debtors seek special damages exceeding $2 million, and claim that their

> entire business lives and reputations were destroyed and that they were placed into

bankruptcy as a result of actions of [Bank]. They also face foreclosure from their home in June, and have lost virtually everything they had.

Debtors' Memorandum on Remand re: Bank Examination Privilege, 5.

## DISCUSSION

Before turning to the privilege issue, we first address Fed's contention that Debtors have "utterly failed to exhaust, or even begin to pursue, administrative remedies." Suggestion of Interest of the Board of Governors of the Federal Reserve System, 6. Fed notes that its rules require private litigants to file written requests with Fed so that its general counsel can determine whether the bank examination privilege should be waived.

> "The administrative process is not an empty formality; rather, . . . it is a process that is designed to provide the agency with the information needed to determine whether and to what extent the agency's privilege should be waived, and to narrow the issues for judicial review."

Suggestion of Interest of the Board of Governors of the Federal Reserve System, 7–8. Fed also contends that the District Court misapplied *In re Bankers Trust Co.*, 61 F.3d 465 (6th Cir.1995) for the proposition that Fed regulations are "unenforceable in the present case." Fed's Suggestion, 7 n. 3, *quoting Vescio, supra*, 205 B.R. at 40. In *Bankers*, Fed argues, "the party seeking Board confidential supervisory information sought the information from the bank only after exhausting its administrative remedies with the Board." *Id.*

█ In the first place, Fed's administrative process is not even an empty formality; it is a total irrelevancy in the instant matter. The District Court held unequivocally that "the regulations on which the Bank relies are unenforceable in the present case," *Vescio, supra*, 205 B.R. at 40, because they "conflict with Rule 34 of the Federal Rules of Procedure."[5] *Id.* at 41. That is the law of the case, and we are bound by it.

---

5. Fed.R.Civ.P. 34, made applicable to this proceeding by Fed.R.Bkrtcy.P. 7034, provides, in pertinent part:

> (a) **Scope.** Any party may serve on any other party a request . . . to produce and permit the party making the request . . . to inspect and copy, any designated documents . . . which are

Moreover, the District Court's holding was perfectly in line with the Sixth Circuit's holding in *Bankers Trust*:

Congress did not empower the Federal Reserve to prescribe regulations that direct a party to deliberately disobey a court order, subpoena, or other judicial mechanism requiring the production of information. [Fed regulations] that require[ ] a party that is served with a subpoena, order, or other judicial process to continually decline to disclose information or testimony exceeds the congressional delegation of authority and cannot be recognized by this court. Such a regulation is plainly inconsistent with Rule 34 and cannot be enforced.

. . . .

Moreover, we find no compelling reason to discard the relatively straightforward discovery methods outlined in the Federal Rules of Civil Procedure simply because the Federal Reserve has attempted to mandate a different procedure.

*Bankers Trust, supra,* 61 F.3d at 470–71.

Fed wastefully argues that precedent relating to exhaustion of administrative remedies is relevant here. In particular, Fed quotes the following passage:

It is a long-standing principle that a litigant's failure to exhaust available administrative remedies precludes judicial review of agency action. Litigants must avail themselves of administrative appeal procedures before access to the courts may be had. This principle is meant to preserve administrative autonomy and promote judicial efficiency.

*U.S. v. Shields,* 733 F.Supp. 776, 785 (D.Vt. 1989). That case has nothing to do with this one. No party is asking Fed for anything. The dispute in this adversary proceeding is between Debtors and the Bank. Fed is a non-party, and no *review* of its actions is being sought. This is a proceeding to compel Bank to disclose relevant documents in Bank's possession, as required by Fed. R.Civ.P. 34. We will not subvert judicial autonomy and efficiency by elevating Fed's rules above our own. The bank examination

privilege belongs to Fed, and it is entitled to an opportunity to assert it; it is our role to decide whether it applies. *Vescio, supra,* 205 B.R. at 43.

■■■ We hold in the first instance that the banking examination privilege does not apply. The bank examination privilege "accords agency opinions and recommendations and banks' responses thereto protection from disclosure." *Bankers Trust, supra,* 61 F.3d at 470. The bank examination privilege was intended to protect "an iterative process of comment by the regulators and response by the bank."

Because bank supervision is relatively informal and more or less continuous, so too must be the flow of communication between the bank and the regulatory agency. Bank management must be open and forthcoming in response to the inquiries of bank examiners, and the examiners must in turn be frank in expressing their concerns about the bank. These conditions simply could not be met as well if communications between the bank and its regulators were not privileged.

*In re Subpoena Served Upon the Comptroller of the Currency, and the Secretary of the Board of Governors of the Federal Reserve System,* 967 F.2d 630, 634 (D.C.Cir.1992). *See, also, Bankers Trust, supra,* 61 F.3d at 471. The privilege does not apply to all content of such communications. "Purely factual material falls outside the privilege, whereas opinions and deliberative processes do not." *Vescio, supra,* 205 B.R. at 42. *See also, In re Franklin National Bank Securities Litigation,* MDL 196, 478 F.Supp. 577, 581 (E.D.N.Y.1979) (official information privilege "does not protect purely factual material.")

■■■ The communications at issue are not the type protected by the privilege, and the content of those communications are mostly fact, not opinion. Much of the material at issue is simply not opinion. Among the documents Fed claims are privileged is a Written Agreement between Bancshares and Fed, dated February 18, 1994, and a cover letter from Fed Bank of Boston Vice Presi-

in the possession, custody or control of the

party upon whom the request is served.

dent E. Philip A. Simpson, Jr., dated Feb. 7, 1994, to Bancshares Board Members requesting they execute the Agreement. Item 1. No redactions were proposed in either the letter or the Agreement. The Agreement itself and the report by Bancshares to Fed on progress in implementing it, Item 10, are not opinion, but fact. They describe concrete actions taken and to be taken, and involve "procedures, customs, practices and guidelines" concerning lending, and loan work-outs, which both this Court and the District Court determined to be discoverable, as well as employee compensation and supervision.

■ Although Mr. Simpson's name is not redacted in Item 1, his name and all other Fed officials' names are redacted in the remaining documents. The names of Fed officials involved in the review are obviously relevant for further inquiry, and just as obviously aren't opinion. The privilege protects the communications, not the communicators. Federal Reserve officials remain free to assert the privilege if and when they are asked about communications deemed to be privileged.

■ Most of the remaining documents are parts of periodic mailings by Fed to Bancshares' Board, which generally consisted of a "Report of Inspection" by Fed of Bancshares, Items 2, 5, 7, 13, sometimes a "Summary to Directors of Inspection Findings," Items 4, 8, and a cover letter from a Fed official to Board members that summarizes the results of the Inspection and Bancshares' current status, and makes a "request that this report be considered at an early meeting of the board of directors and that a record of the action taken be noted in the minutes of the meeting." Items 2, 3, 6, 12. Finally, each mailing of this type also included a form "letter of acknowledgment" to be signed by each director, stating that the signatory has read the cover letter and examiner's comments. *Id.*[6] In Items 9 and 11 Bancshares reports on its responses to the Inspection Reports.

Fed contends that the bank examination privilege, designed to protect a "relatively informal," "iterative process" also extends to formal reports formally submitted to a board of directors for formal action to be recorded in the minutes of the board's meeting. We disagree. The Reports, with specific recommendations for action, were forwarded to the Directors with a "request" for prompt action. While every recommendation presumably includes the implied opinion that it is necessary and reasonable, Fed, in essence, directed that the Directors do what they were told, and promptly. Matters formally reviewed and acted upon by a board of directors are matters of corporate governance, for which records must be kept, 11A V.S.A. § 16.01(a), and are beyond the scope of the privilege. *Cf. In re Subpoena,* 967 F.2d 630 (D.C.Cir. 1992) (Privilege not waived or weakened "merely because" report provided to bank.).

Fed proposes to redact all references to a Memorandum of Understanding among Bank, FDIC, and the State Department of Banking and Insurance. For example, on pages 1–2 of the Summary to Directors of Inspection Findings for Inspection conducted as of March 31, 1995, Item 2, Fed proposes the following redaction, indicated by strikethrough: "Capital levels are ~~fair~~ and remain in compliance with the minimum requirement mandated by the ~~Memorandum of Understanding imposed upon Merchants by the FDIC and State on October 29, 1993.~~" The list of abbreviations on Page 2–(1) of the Report, Item 5, also redacts "MOU" and its definition from a list of abbreviations. Similarly, a reference to Bank's compliance with the Memorandum, a matter of fact, was deleted at Page 3–(3). Fed also redacted factual references to MOU from Item 9, a letter from Bancshares to Fed reporting on its progress. The existence of MOU and the status of Bank's compliance with it are clearly not matters of opinion. The existence of constraints "imposed" upon Bank during the course of its dealings with Debtors, Debtors' Amended Affirmative Defenses and Counterclaims, ¶¶ 7–8, is clearly relevant.

---

**6.** Copies of the acknowledgment letters were included with Items 2, 6, and 12, but not for Item 3.

In addition, Fed proposes to redact virtually all references to the ratings given to Bank and Bancshares, and its boilerplate language stating what the particular rating means. Redactions related to the current status and history of compliance with Federal Reserve requirements are matters of fact, not privileged, and relevant to Debtors' case in the same way that an ocean is to a wave that travel within it. Obvious and numerous questions come to mind upon reading the redactions that relate very specifically and directly to Debtors' case. In some instances, redacted material merely reiterates what was in the Written Agreement between Bancshares and the Federal Reserve, which is not subject to the privilege. In other instances, plainly factual material is redacted, and the same or similar material is sometimes redacted and sometimes not. We note that Page 3–(1) of the Report in Item 2 redacts a factual description of a "loss-sharing" agreement between Bank and FDIC. The same material is not redacted in Item 5, Page 3–(1). Another example of this pattern appears in connection with the Summary and Report at Items 4 and 5. The following sentence appears both in the Summary, Page 1, where it is not redacted, and in the Report, Page 1–(3), where it is redacted: "The goal is to reposition the bank as an efficient, customer-oriented, highly competitive community bank." We can't conceive of any reason why the sentence was redacted in the first place.

Although many of the proposed redactions are pure fact, none of significance appear to be pure opinion. Judge Weinstein's review of bank examination reports in the *Franklin* case persuaded him that "no such crisp distinction can be drawn between 'opinion' and 'fact.'" Most of the redacted passages that are not purely factual, could "be characterized as 'shorthand' statements of fact." *Franklin, supra,* 478 F.Supp. at 584.

> The problem, as Justice Holmes observed, [is] that statements of conclusion often only collect and summarize statements of fact; such a "statement may be called a conclusion, but it is a conclusion of fact, just as the statement that a certain liquid was beer is a conclusion of fact from certain impressions of taste, smell and sight."

*Id., quoting Southern Railway Co. v. King,* 217 U.S. 524, 538, 30 S.Ct. 594, 598, 54 L.Ed. 868 (Holmes, J., dissenting). The following two examples, indicated by strike-through, cover the vast majority of the remaining proposed redactions. The first illustrates the frequent omission of words that characterize current status. The second example is typical of bulk redactions frequently encountered. Both illustrate the kind of blurring of fact and opinion that predominates in the redacted material.

> The financial condition of Merchants Bancshares, Inc. (Bancshares), Burlington, Vermont, ~~has weakened~~ since the visitation conducted in May 1991 and is now considered ~~only fair~~.

Item 13, p. 1.

*Loan Administration*

> ~~Notwithstanding the limited scope review of this area during the inspection, management reports revealed a lack of thorough knowledge of certain credit-related regulations and guidelines as well as departures from generally accepted prudent banking practices. Concerns relative to interest accruals and capitalization, restructured loans and OREO are addressed beginning on page 4(3).~~

*Id.* 1–(3). Judge Weinstein's comments about similar redactions in *Franklin* are appropriate here.

> "[T]his statement undoubtedly expresses an opinion, but it also contains a significant factual component.... It is a shorthand statement condensing many individual observations and impressions.
>
> ....
>
> In this sense, then, the [matters] redacted by the government are not opinions, but are factual statements by a first hand observer of the bank; they should not be protected from disclosure.... To be sure, some of examiner's comments contain less of this factual component than others, and thus perhaps deserve protection by the privilege. These few exceptions, however, are both trivial and harmless and do not justify the effort necessary to weed them out. Moreover, cutting a phrase here and there would make the document difficult to

read and almost impossible to evaluate fairly."

*Franklin, supra,* 478 F.Supp. at 585. Accordingly, we hold that the privilege does not extend to the 13 documents at issue.

 To the extent that the privilege does apply, we further hold that the interests of justice require that it be overridden in this case. Justice Dooley, of the Vermont Supreme Court, reminds us that "the most important point of privilege doctrine was set forth by Chief Justice Burger in *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974):

> Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."

*Douglas v. Windham Superior Court,* 157 Vt. 34, 39–40, 597 A.2d 774 (1991). In its opinion on remand, the District Court instructed us that "the privilege may be defeated 'where necessary to promote 'the paramount interest of the Government in having justice done between litigants,' ... or to 'shed light on alleged government malfeasance,' ... or in other circumstances 'when the public's interest in effective government would be furthered by disclosure.'" *Vescio, supra,* 205 B.R. at 42.

> The good cause inquiry requires the court to consider, at a minimum, the following:
>
> (1) the relevance of the evidence sought to be protected;
>
> (2) the availability of other evidence;
>
> (3) the "seriousness" of the litigation and the issues involved;
>
> (4) the role of the government in the litigation; and
>
> (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*Id.* We consider each factor in turn.

Debtors allege that Merchants Bank whipsawed them, encouraging them to go out on a precarious limb of deep debt, then cutting the branch off behind them, causing them to take a long fall into the ravine of bankruptcy. The disputed documents are unquestionably relevant for a number of reasons. In the first place, they suggest a motive for why Bank might do what Debtors allege it did. Bancshares was subject to strict control and oversight by the Federal Reserve, and was being required to act expeditiously to deal with questionable loans. Debtors have alleged that Bank officials made various representations that loan closings were imminent. The various reports suggest that Bank was under significant pressure and/or legal obligation that prevented it from going forward with Debtors' financing, and that it was foreseeable at the time that Debtors' loans might be sold off as part of a plan to return Bank to a more solid financial foundation. The disputed documents are directly relevant to the issues of Bank's lending and workout procedures and its supervision of loan and workout officers. Debtors have the right to introduce evidence about the financial context in which Bank was dealing with their claims.

The various cover letters, summaries and inspection reports are the best evidence of the strict regimen to which Bank was subject, and of the pressures on Bank to dispose of questionable loans. They document the existence of considerable pressure on Bank to get rid of troubled loans during the time when Bank was dealing with Debtors, as well as the particular steps taken, and the impact of those steps on Bank's financial stability. The Written Agreement, which controls matters we have held to be relevant, would go undiscovered if we upheld the privilege, as would all references to the Memorandum of Understanding. Accordingly, we conclude that the evidence is not otherwise available.

Debtors contend Bank's unfair and dishonest dealings with them forced them into bankruptcy, and the loss of what they'd worked hard for years to build up. Those are serious charges. Although Debtor faces serious obstacles to making them stick, we would have to agree with FDIC's characterization: "[I]t appears at least on the surface ... that the suit is probably not frivolous." Memorandum of the Federal Deposit Insurance Corp. on Remand, 3. Our system of government guarantees Debtors the opportunity to be heard on the issue, and to present all the relevant evidence available. Accord-

ingly, we find the litigation to be serious, not frivolous.

The government is not a party to this litigation, nor have there been any suggestions that either the FDIC or the Federal Reserve have acted improperly. Governments and government agencies are frequently called upon to make hard policy decisions that sacrifice the interests of the few for the benefit of the many. *See, e.g.,* John 11:50 (NIV) ("[I]t is better . . . that one man die for the people than that the whole nation perish."). In a free society, however, those called upon to make the sacrifice have the right to hold policy makers and implementers accountable, to discover what the policies are, the reasons for the policies, and to demand that they be carried out fairly and impartially. Nothing that we have seen in the record before us suggests that the policies and procedures imposed on Bank by the Federal Reserve were anything but fair, neutral, and necessary. Debtors allegations, however, which remain to be proven, taken in the context of the regimen imposed on Bank, suggest the possibility that Bank may have dealt with them unfairly and dishonestly, and thereby made Debtors' losses greater than they otherwise would have been. The government's role in this case is not as the cause of Bank's problems, but as the stern disciplinarian that saved Bank from itself. Nevertheless, the government changed, if it did not create, the context in which Bank dealt with Debtors. Fundamental fairness demands that Debtors be able to show what that context was, and how Bank's actions within that context affected Debtors. Government's role in the matter cuts in favor of disclosure, not concealment.

■ Disclosure of matters of corporate governance will not make for "future timidity by government employees who will be forced to recognize that their secrets are violable." *Vescio, supra,* 205 B.R. at 42. Communications made in the "relatively informal," "iterative" process that the privilege was designed to protect, still will be subject to that qualified privilege. The fact that the privilege is indeed qualified, not absolute, means that the government employees must in any event always be cognizant of the fact that

their "secrets" may well, someday, be violable. More important, we did not discover in this document any "secrets" of government employees.

Finally, it is Fed's "burden to establish the existence and applicability of the privilege," *Walsh v. Chittenden,* 799 F.Supp. 405, 407 (D.Vt.1992). We were not shown and did not find the "'precise and certain reasons for preserving the confidentiality of the governmental communication,' necessary both to overcome the plaintiff's patent need to examine the records and to dispel the court's reluctance to interfere with the truth-seeking process." *Id.* at 409–10, *quoting Lundy v. Interfirst Corp.,* 105 F.R.D. 499, 504 (D.D.C. 1985).

## CONCLUSION

For the reasons hereinbefore set forth, we hold that none of the Fed-related documents are privileged, and, in the alternative, that the interests of justice require that the qualified banking examination privilege be overridden in this case. All documents covered by this Memorandum of Decision shall be subject to a protective order, and shall not be disclosed except to counsel, the parties and their respective experts. Further dissemination, unless and until otherwise expressly ordered by this Court shall be punished as a contempt of Court. Prior to trial, the parties shall serve copies of their exhibit lists upon Fed, taking care to point out to Fed whether they intend to introduce or use in any way any of the items covered by this Memorandum as exhibits at trial. If it so desires, Fed may request a hearing to argue against the admission of any such documents or to request that the record as to such items be sealed. At any such hearing, Fed shall be prepared to make a particularized showing as to each document or part of a document that it wants protected.

Debtors shall settle an order consistent with the terms of this Memorandum on five days' notice.