In re Pasquale VESCIO and Vatsala Vescio, Debtors.

The MERCHANTS BANK, Amresco New England II, Inc., Plaintiffs,

v.

Pasquale J. VESCIO and Vatsala Vescio, Defendants.

Bankruptcy No. 96–10153.
Adversary No. 96–1015.

United States Bankruptcy Court,
D. Vermont.

May 21, 1997.

T.L. Holzman, of Federal Deposit Insurance Corp. (FDIC), Washington, DC, and C. Shea, of U.S. Attorney's Office, Burlington, Vt., for FDIC.

R.A. Pinel, of Miller, Eggleston & Cramer, Ltd., Burlington, VT, for Merchants Bank.

J.T. Schwidde, Glinka & Schwidde, Rutland, VT, and L. Chalidze, Miller & Faignant, Rutland, VT, for Debtors/Defendants/Counterclaim Plaintiffs Pasquale and Vatsala Vescio.

K.H. Wheatley, and D.B. Jordan, of Federal Reserve, Washington, DC, and C. Shea, of U.S. Attorney's Office, Burlington, VT, for Board of Governors of Federal Reserve System.

## MEMORANDUM OF DECISION RULING ON PRIVILEGE ASSERTED BY FDIC

FRANCIS G. CONRAD, Bankruptcy Judge.

Debtors requested that Bank produce various documents in its possession that FDIC claims are privileged. After *in camera* review of the disputed documents, we now rule[1] on FDIC's claim of privilege. Two prior opinions—one of ours and one from the District Court—set out the procedural history of this matter and provide more extensive discussions of the applicable law and facts. We repeat here only the minimum necessary to explain our rulings.

Our December 9, 1996 Order on Counter-Claimant Vescios' Motion to Compel required Bank to disclose four categories of documents, including investigative materials and bank examination reports generated by FDIC and Fed. More particularly, we required:

1) full disclosure by The Merchants Bank of all documentation, no matter by whom generated, relating to investigation of The Merchants Bank and/or Merchant Bancshares, Inc. by the FDIC, the Federal Reserve, and other related bank regulatory entities, including the examination reports, which documentation the Court finds to be of relevance to the claims asserted against TMB; 2) TMB's lending manuals and all information on TMB's lending procedures, customs, practices and guidelines; 3) TMB's procedures, customs, practices and guidelines on compensation of its lending and work-out officers ...; and 4) TMB's procedures, customs, practices and guidelines in relation to the work-out of troubled loans.

*Merchants Bank v. Vescio*, No. 96–1015, 2 (Bkrtcy.D.Vt. Dec. 9, 1996) (order on counter-claimant Vescios' motion to compel) (hereinafter "Discovery Order"). Bank took

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the General Reference to this Court under Part V of the Local District Court Rules for the District of Vermont. This is a core matter under 28 U.S.C. § 157(b)(2)(A), (B), and (O). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable by F.R.Bkrtcy.P. 7052.

an interlocutory appeal to the District Court, which reversed our holding as to the first category of documents. *Merchants Bank v. Vescio*, 205 B.R. 37, 41–42 (D.Vt.1997) (hereinafter "Remand Order"). The District Court held that there exists a qualified "bank examination privilege" which may apply to those documents. The District Court specifically held, however, that the documents "described in subsections (2) through (4) of [our] order[ ] are purely factual matters for which the bank examination privilege is not available."[2] *Id. Id.*, at 42–43. The matter was remanded to us with instructions to review the disputed material *in camera*, to determine whether the privilege applies. *Id.*, at 43.

This Memorandum of Decision is concerned solely with those documents submitted for review in connection with FDIC's claim of privilege.[3] We addressed Fed's claims of privilege as to other documents in our prior memorandum, issued after the Remand Order. *In re Vescio*, 208 B.R. 122 (Bkrtcy.D.Vt.1997) (hereinafter "Fed Opinion").

Bank presented the documents shielded behind the FDIC's claim of privilege in bulky envelopes dividing the materials into three categories. We describe briefly the contents of each category before discussing issues of privilege.

Category One consists of documents flowing back and forth between FDIC and Bank during a broad-ranging Bank makeover.

Category Two contains "Classified Asset Lists" and "Action Plans" for various borrowers that was submitted by Bank to FDIC. FDIC makes no claim that this category is privileged, but argues that it is not relevant or likely to lead to discoverable evidence.

Category Three has information and submissions by Bank to FDIC, which FDIC contends are also not relevant.

Chronologically, the piece of the story we had before us began with FDIC's May 3, 1993 "Report of Examination", Category One, Item 2(a).[4] The thoroughness of FDIC's examiners as expressed in the documents they generated is impressive. In this Item as well as all the other FDIC-generated documents, no judgments or condemnations are made. Bad lending practices, which brought Bank close to failure, are described and dissected methodically, with fact after fact, instance after instance. Item 2(a) resulted in an October 1993 "Memorandum of Understanding" (hereinafter "MOU"), among Bank, FDIC, and the Vermont Dept. of Banking, Insurance, and Securities. Category One, Item 1. The MOU dictates numerous changes across a whole gamut of Bank operations, and demands accountability for implementing those changes.

Bank's responses over time document the transformation of its lending culture and its bottom line. FDIC and the State removed the MOU effective October 15, 1996, after the Report of Examination as of March 31, 1996. (Category One, Item 2(d)). That Report found that as a result of Bank's "proactive approach to improving the institution" under the MOU's constraints, Bank's "financial condition has improved significantly and is now considered satisfactory." It is clear from the record before us that the few bad apples in Bank's management didn't spoil the bushel. Bank's dramatic turnaround was accomplished by the combined efforts of competent and committed employees, old and new. The patterns and practices engaged in by Bank's bad apples are clearly relevant to Debtors' case. It remains to be proven, how-

**2.** As we note below, some of the items withheld as belonging in the first category in fact belong in the categories described by the District Court as "purely factual."

**3.** Bank is chartered by the State of Vermont, which makes it subject to oversight by FDIC, whose privilege claims are considered separately. Fed regulates bank holding companies, including Bank's parent, Merchants Bancshares, Inc. ("Bancshares").

**4.** We will refer to the documents as they were organized by Bank for presentation to us. The specific "Items" within Categories One and Three are designated in footnotes during the separate discussion of those categories, *infra*. No itemization was provided for the documents in Category Two, and our summary handling of the documents as a class makes itemization unnecessary.

ever, that Debtors' problems had anything to do with Bank's.

FDIC highlighted in yellow material that it concedes is relevant, primarily factual, and not privileged. Blue was used for privileged relevant material. The great weight of the papers was unmarked, which FDIC reserved for materials it deems "clearly irrelevant." FDIC's Memorandum on Remand, 2. FDIC says material was marked yellow if it "deal[s] with the issues of loan origination, administration or workout that review of the Vescios' claims indicates are areas of potential relevance." *Id.* In fact, vast quantities of material that specifically involved these areas, including the entirety of Category Two, were left unmarked. In addition, FDIC's test of relevance is far too limited, omitting completely, for example, issues related to employee performance and compensation raised by Debtors' negligent supervision claim.

### CATEGORY ONE

■ Item 1[5] of Category One is the October 1993 MOU, which was entered into "in response to the unsatisfactory findings presented" in Item 2(a), the May 3, 1993 "Report of Examination" by FDIC. Item 1, 1. The MOU also figured in our review of documents that Fed contended were privileged. Fed proposed to redact all references to the MOU, which one Fed document described as

"imposed upon Merchants by the FDIC and State on October 29, 1993." [6] As we noted in Fed Opinion, *supra,* 208 B.R. at 128–29, "The existence of MOU and the status of Bank's compliance with it are clearly not matters of opinion. The existence of constraints 'imposed' upon Bank during the course of its dealings with Debtors, Debtors' Amended Affirmative Defenses and Counterclaims, ¶¶ 7–8, is clearly relevant." Moreover, the document creates or calls for the creation of "procedures, customs, practices and guidelines regarding lending, compensation, and the workout of troubled loans," which we have already ordered to be produced, and which the District Court has determined to involve "purely factual matters for which the bank examination privilege is not available." *Merchants Bank v. Vescio,* 205 B.R. 37, 43 (D.Vt.1997).

Group 2 items consist of four Reports of Examination. The great bulk of Item 2 consists of material left unmarked because FDIC deemed it irrelevant. We will not honor FDIC's reservation of a right to assert a privilege as to any unmarked material that it deems privileged. We have reviewed all the unmarked material as if FDIC had claimed the privilege.

As noted earlier, Item 2(a), a Report of Examination as of the close of business on May 3, 1993, resulted in the MOU. The FDIC Reports that follow document Bank's

---

5. Our references to the documents in Group One are based on the following list, provided by Bank when submitting them for our *in camera* review.

1. Memorandum of Understanding
2. Reports of Examination
 a. May 3, 1993
 b. January 1, 1994
 c. December 31, 1994
 d. March 31, 1996
3. Compliance Reports
 a. July 14, 1993
 b. March 27, 1995
4. Merchants Bank Progress Reports
 a. November, 1993
 b. December, 1993
 c. January, 1994
 d. April, 1994
 e. June, 1994
 f. December, 1994
 g. March, 1995
 h. June 8, 1995
 i. July 27, 1995
 j. October 26, 1995
 k. January 26, 1996

l. March 31, 1996
m. June 30, 1996
5. Business Plan Progress Reports
 a. September 30, 1993—December 31, 1993
 b. December, 1994
 c. March, 1995
6. Responses to Reports of Examination
 a. October 8, 1993
 b. August 19, 1994
 c. November 21, 1996
7. Response to Compliance Reports
 a. September 30, 1993
 b. July 27, 1995
8. Miscellaneous
 a. FDIC Compliance Examination Summary, dated July 14, 1993
 b. November 23, 1993 Letter from Bank
 c. September 2, 1993 Letter from Bank

6. The Fed document making the quoted reference was a Summary to Directors of Inspection Findings for Inspection conducted as of March 31, 1995.

compliance with the MOU. The Reports include an Officer's Questionnaire and a Treasurer's Questionnaire. We will permit FDIC to redact, for all Reports, the answers to Question 12 on the Officer's Questionnaire and Item 11 on the Treasurer's Questionnaire, because they consist of duplicate copies of letters from Bank's attorneys to FDIC describing the status of various lawsuits. We will also permit redaction from all Reports of the answer to Question 23 of the Officer's Questionnaire and Item 40 of the Treasurer's Questionnaire, which are identical answers to an inquiry about possible employee theft of bank funds or property.

The great bulk of Item 2(a) directly concerns Bank's loan portfolio, including its soundness, administration, and impact on Bank's operations. More than 20 loans in the category of $1.5 million and over are individually discussed. Only two of the loan discussions contain any FDIC highlighting. We can perceive no difference in relevance between loans that are colored and those that are not. All of the material in the Report is primarily factual. To the extent that opinion figures in, it is the sort of " 'shorthand' statements of fact" discussed in Fed Opinion, *supra*, 208 B.R. at 128–30. The colors used do not distinguish between pure fact and such "shorthand" facts in any consistent way, as the following example indicates. Bold is used to indicate text FDIC highlighted blue, claiming privilege. Text that FDIC colored yellow to indicate relevant, non-privileged factual material appears as normal text. Places where we have redacted the names and identifying characteristics of Bank's customers are indicated by "XXXX," or by brackets, i.e., [SELLER] or [BORROWER].

**Loan (1) originated 10/29/90 $1,749.5M to purchase a commercial building from [SELLER]. Proceeds of this loan paid off a loan at this bank to [SELLER], which was adversely classified Substandard at the last examination.** Original repayment terms were $15M per month; however, on 10–15–91, less than one year from the inception of the loan, terms were modified to zero percent interest for 3 years, calling for principal only payments of $5M per month. **Loan (2) originated 6–29–90 at $200M to fund an inducement payment to [SELLER].** Original terms were zero percent interest, with principal payments of $1.7M commencing 10–31–91. Collateral for both loans consists of a first RE mortgage on the commercial building, appraised as of 9–15–89 at $1,930M, **in an appraisal prepared for XXXXX, a principal of [SELLER].** The use of the stale appraisal, as well as the fact that it was prepared for the original borrower, is cited elsewhere in this report as an apparent violation of Part 323 of the Corporation's Rules and Regulations. A subsequent appraisal dated 11–1–92 valued the property at only $925M. **While the new appraisal was prepared for the new borrowers, its assumptions appear reasonable and the value assigned appears well supported.**

The credit file contained no evidence that any credit analysis was performed when the loan to the **[BORROWERS]** was granted. In fact, financial information for **[BORROWER'S COMPANY]**, which was available when the loan was granted, indicated an insolvent company which was experiencing losses. The **[BORROWERS]** offered little support to the credit individually, and there appears to be no justification for a loan of this size to these borrowers. Given these facts, it is readily apparent why it became necessary to restructure the loan at a zero interest rate less than one year after inception. The granting of this loan to unqualified borrowers, with a purchase price apparently far in excess of market value, with no current appraisal required, in apparent violation of Part 323, along with no analysis conducted as to repayment capacity, is clearly contrary to prudent lending standards, and **raises the question as to the exposure to the bank from a lender liability standpoint. It would be difficult for the bank to show that it exercised prudent underwriting standards in the granting of these loans.** When questioned, President Davis stated that there was no intent on his part to defer a loss on the **[SELLER]** credit; however, it is evident that this was the result. **Accordingly, the $925M value of the underlying RE is classified Substandard, and the**

**balance Loss, less $15M in payments received during the examination.**

**Originating and Servicing officer: Dudley H. Davis**

Sometimes names and numbers are redacted and sometimes not. Names and numbers are clearly not opinion or deliberation. Sometimes fact-based opinion is redacted—references to the Bank's lender liability exposure, for example—and sometimes not, as when violations of Bank's rules and regulations and prudent lending standards are discussed.

Redactions in the other Reports also fail to consistently distinguish fact and opinion. The first two pages of the Report as of Jan. 10, 1994, Item 2(b), are not colored, indicating FDIC's conclusion that the material is not relevant. The subject discussed there was Bank's past and present lending practices, the problems resulting, and deficiencies that need correction. Some of the same material is reiterated, beginning on Page 1-2, but this time denominated with highlighter as plainly factual manner. Numbers and other factual material continue to be redacted. Some short-hand factual material is redacted, some not. We hold that all of the Reports in Group 2, with the exceptions noted above, are to be disclosed as hereinafter provided.

Group 3 consists of two "Compliance Reports," generated by FDIC after "examination for compliance with applicable consumer and civil rights rules and regulations." Items 3(a), p. 1, and 3(b), p. 1. The Reports describe the various rules and regulations applicable, then discuss the Bank's performance in meeting them, including in some instances, the reasons for noncompliance and possible remedies. Violations of some rules and regulations are highlighted, but the vast bulk are not. We find that the Reports in Group 3 are overwhelmingly factual, and they are to be disclosed as hereinafter provided.

Group 4 consists of 14 periodic reports from Bank to FDIC reporting on Bank's compliance with the requirements of the Memorandum of Understanding, Item 1. They are overwhelmingly factual, consisting primarily of a column on the left that lists MOU requirements and a column on the right that reports facts about Bank's response to each requirement to date. FDIC's very limited acknowledgment of relevancy is at times consistently inconsistent. Some entries relating to specific MOU requirements are generally identified as relevant, while others that plainly meet even FDIC's narrow test of relevance are generally not. The issue of loan policy revision, which the documents refer to by reference to MOU page 6, # 7A, are generally identified as factual and relevant, but those related to the appraisal policy, MOU p. 6–7, # 8, generally are not. Appraisals, of course, even by FDIC's test of relevance noted above, clearly deal with "loan origination, administration or workout." This is one example only of a fairly consistent pattern of identifying some aspects of lending as relevant and excluding other aspects just as relevant. The same items are sometimes denominated as irrelevant and sometimes relevant. The MOU's requirement that Bank establish an effective loan review and grading function is one such example. *Compare* reference to MOU p. 7, # 9 in Items 4(a) and 4(k) with same reference in Item 4(e). In any event, the progress reports in Group 4 are factual, the privilege does not apply, and Group 4 must be disclosed as hereinafter provided.

Group 5 consists of three periodic Business Plan Progress Reports prepared by Bank. Much that is specifically relevant to Bank's lending is treated as irrelevant. The material is factual, and not within the privilege. It should have been produced long ago.

Groups 6 and 7 are periodic responses by Bank to the Reports of Examination, Group 2, and Compliance Reports, Group 3, respectively. Again, plainly relevant material is classified as irrelevant. We also noticed instances where responses to particular issues marked relevant in FDIC's Report were not marked in Bank's responses to the same issues. The material is factual, not privileged, and should have been produced.

## CATEGORY TWO

■ Category Two consists of "Classified Asset Lists" and "Action Plans" for various

borrowers. They are unquestionably relevant, because they deal with lending and loan workout. We perceive no basis for FDIC to claim any privilege as to Bank's documents. They shall be disclosed, as hereinafter provided.

## CATEGORY THREE

 Bank's Submission, 4, describes the documents in Category Three [7] as "miscellaneous information which the FDIC believes not to be relevant because the information does not relate to loan origination, loan administration or loan workout as those issues are raised in the Vescios' Amended Counterclaims." [8] FDIC is not a party to this action and its pronouncements about what is or is not relevant is not relevant. We were directed by the District Court to give FDIC an opportunity to assert the banking examination privilege. It makes no attempt to explain how any of the documents in this category fit within that privilege. Most are clearly Bank policy documents as to which

FDIC claims of ownership or privilege would be laughable if made. Bank's lending practices, past and present, are at the core of most documents, which range from budgets to business plans. In some cases, these are documents that fit squarely within the category of documents two courts have already ordered disclosed: "lending manuals and the procedures, customs, practices and guidelines regarding lending, compensation, and the work-out of troubled loans." *Vescio, supra,* 205 B.R. at 43. Examples include Bank's Asset/Liability Policy, Item 3(d), 1/1/94 Business Plan, Item 3(i), and, incredibly, its Credit Policy Guide, Item 3(k). All of the documents in Category Three, with the one exception noted below, should have been disclosed long ago.

Item 2 is an FDIC Report of Examination of Information Systems as of June 10, 1996. "The examination included a review, to the extent considered necessary, of audit coverage, management systems and programming," computer operations, electronic funds trans-

---

**7.** The documents in Category Three, as organized by Bank, consist of the following:
1. Miscellaneous
 a. 1/12/94 newspaper article
 b. 11/27/95 letter from James Chaston to Joe Boutin
 c. Synopsis of Federal/State Compliance Regulations
 d. Regulatory Progress Report for 4/21/95 Board of Directors' meeting
2. June 3. 1996 Report of Examination—Information Systems
3. Merchant Bank and Related Entity Documents
 a. Merchants Trust Company 1995 Business Plan
 b. Merchants Bancshares, Inc. December 31, 1995 Profit Plan
 c. Bank/Bancshares, Inc. Dividend Policy
 d. Bank Asset/Liability Policy
 e. Bank Investment Policy
 f. Bank December 31, 1995 Profit Plan
 g. Bank 12–21–95 Discussion: GAP
 h. Bank Budget/Actual Review Process
 i. Bank Profit Plan dated January 1, 1994
 j. Bank Payment to Affiliates, Quarter 4, 1993
 k. Bank Credit Policy Guide
 l. Bank pro forma loan schedules
 m. Bank July 8, 1995 Strategic Plan for 1995—1998
 n. Bank Capital and Debt Service, monitoring, Quarter 4, 1995
 o. Bank 1996 Capital Budget Forecast
 p. Bank 1996 Budget

**8.** Bank's Submission, 4, contains the following paragraph in its discussion of Category Three documents, which puzzles us:

> Documents were withheld from this submission on two grounds: attorney-client privileged information and because the documents belong to the Federal Reserve and the Bank does not have the authorization to submit the documents. Documents withheld from this submission are identified on an attached sheet.

We do not understand whether this paragraph refers to the documents we received and reviewed, or to other documents that were withheld from review. The only attachment was a list of the documents we did get. Neither Federal Reserve nor FDIC appear to understand or apply concepts of privilege in the same way that most other participants in the judicial process do. Nevertheless, it strains credulity to suggest that either would apply attorney-client privilege or agency ownership to the Category Three documents we did receive. Accordingly, we direct that Bank file a Statement of Clarification, indicating whether any documents were withheld from this submission, and, if so, a detailed log identifying the documents, the privilege claimed, and the precise reasons for withholding them. In the event that further documents are withheld without a good-faith, mainstream basis for doing so, costs and attorneys fees will be awarded. Given the law of this case, the contention that the Federal Reserve or FDIC owns documents in Bank's possession will not constitute a good faith reason for withholding.

**920**

fer systems, teleprocessing, data security, data control, microcomputers, and networks." Item 2, p. 1. This document does not appear to us to be relevant in any way to any of the issues raised in this proceeding, so it may be withheld.

### CONCLUSION

■ For the reasons and with the exceptions noted above, we hold that the FDIC-related documents are not privileged, and, in the alternative, for the reasons specified in Fed Opinion, *supra,* 208 B.R. at 129–31, that the interests of justice require that the qualified banking examination privilege be overridden in this case. All documents covered by this Memorandum of Decision shall be promptly disclosed. Bank may, if it chooses, redact the borrowers' names and similar information that would identify its customers, but shall not redact loan amounts, dates, payments, bank officials' names, etc. Loan numbers shall not be redacted, so that Debtors may easily identify loans to Bank in the event they want to follow up. All documents disclosed pursuant to this Memorandum shall be subject to a protective order, and shall not be disclosed except to counsel, the parties and their respective experts. Further dissemination, unless and until otherwise expressly ordered by this Court shall be punished as a contempt of Court. Prior to trial, the parties shall serve copies of their exhibit lists upon FDIC, taking care to point out to FDIC whether they intend to introduce or use in any way any of the items covered by Category One of this Memorandum as exhibits at trial. Items in Categories Two and Three are not within FDIC's zone of influence.

The effectiveness of the collaboration between Bank and FDIC makes us a bit wary of rocking the boat by ordering disclosure. Still, we are left wondering whether the people, at some point in the process, shouldn't be allowed to see their government's achievements. If it so desires, FDIC may request a hearing to argue against the admission of any documents or to request that the record as to such items be sealed. At any such hearing, FDIC and Fed shall be prepared to make a particularized showing as to each document or part of a document that they want protected.

Counsel is reminded that privileges emerge to meet exigent circumstances from "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. The banking examination privilege, so-called, seems to us to have emerged out of the Official Information Privilege, discussed by Judge Weinstein in *In re Franklin National Bank Securities Litigation,* 478 F.Supp. 577 (E.D.N.Y.1979). Indeed, the five-part test we were instructed to utilize on remand derives from *Franklin. Compare id.* at 583 with **Remand Order,** *supra,* 205 B.R. at 42. The elements developed there were designed to protect *intra-governmental* communications that were never intended to go outside the agency. Different needs and circumstances may require us to take account of different factors. We invite good argument about real disputes, but we don't want to have to thresh such slender reeds as these again. More particularly, if FDIC believes the privilege is necessary for the work of FDIC examiners, then we would like to hear about it from the examiners themselves. What we don't want more of is legal labels haphazardly thrown at issues, plainly relevant material hidden behind glaringly improper claims of privilege, and so much time devoted to matters that are argued so perfunctorily. If confidentiality really is important to the people and the process that produced a turnaround at Merchants Bank, then we want to hear how and why from the people who actually did the job.

Debtors shall settle an order consistent with the terms of this Memorandum on five days' notice.